# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## Virginia M. YODER
### Senior Chief Operations Specialist (E-8), U.S. Coast Guard

### Docket No. 001-62-13

### 9 September 2013

General Court-Martial convened by Commander, First Coast Guard District.  Article 39(a), UCMJ, sessions by teleconference at Washington, D.C., and Boston, Massachusetts, on 24 May and 19 June 2013.

| | |
|---|---|
| Military Judge: | LTC Charles C. Hale, USMC |
| Trial Counsel: | LT Gary C. Murphy, USCG |
| Assistant Trial Counsel: | LT Robert W. Canoy, USCGR |
| Military Defense Counsel: | LT Tyler McGill, USCG |
| Civilian Defense Counsel: | Mr. Ernesto C. Gapasin |
| Appellate Defense Counsel: | LCDR Ted R. Fowles, USCG |
| Appellate Government Counsel: | LCDR Amanda M. Lee, USCG |

## BEFORE
## McCLELLAND, NORRIS & GILL
Appellate Military Judges

McCLELLAND, Chief Judge:

This is a Government appeal under Article 62, Uniform Code of Military Justice (UCMJ).  The accused is charged with failing to register a firearm on Hanscom Air Force Base, possessing a firearm without a license required under Massachusetts law, and possessing ammunition without possessing a firearm identification card as required under Massachusetts law, among other firearm-related offenses.  On 11 June 2013, the military judge granted Appellee's motion to suppress, *inter alia*, a Bushmaster XM-15 rifle and ammunition, which were seized from her home on 30 November 2012.  The Government gave notice of its appeal of the ruling on 13 June 2013.  On 1 July 2013, the Government filed with this Court the authenticated record of trial.  The Government filed its appeal brief on 19 July 2013. Appellee filed her brief on 9 August 2013.

The Government appeals the military judge's conclusions of law with respect to the suppression of the Bushmaster XM-15 rifle and ammunition, raising the following issues:

I.   The rifle should not be excluded because the officers had probable cause from an independent source to seize it, and therefore it would have been inevitably discovered.

II.   The military judge erred when he found that the accused did not voluntarily consent to a search of her home.

III.   The military judge erred when he did not make findings of fact or a conclusion of law with respect to the accused's adult daughter's consent.

Under Article 62, we act only with respect to matters of law, which we review *de novo*. We reject the military judge's findings of fact only if they are clearly erroneous or not supported by the evidence.

We affirm the military judge's conclusions and ruling.

## Facts

The facts are as follows, based on the military judge's Findings of Fact (FoF), found in Appellate Exhibit 46, and also in the 19 June 2013 transcript (R₂ at 9-21).[1]  Information in footnotes in this section concerning evidence not found in Findings of Fact is included to make the story easier for the reader to understand, but cannot be considered as facts for the purpose of our decision, as they were not embraced by the military judge.

On 30 November 2012, the principal of Hanscom Middle School contacted Hanscom Air Force Base Security (Security) to investigate the whereabouts of the accused's twelve-year-old daughter, who had a history of truancy and was absent from school that day.  (FoF 1, 2.) Security dispatched an officer to the accused's residence.  (FoF 3.)  The dispatched officer was accompanied by two other Security personnel who were in his vehicle at the time.  (*Id.*)  The accused was not there; she was at the Wellness Center for two appointments.  (FoF 13.)  After a delay, the door of the accused's residence was opened by the accused's eighteen-year-old

---

[1] The page numbering of the 19 June 2013 transcript starts over from page 1.  Citations to the 24 May 2013 transcript are designated R₁.  Citations to the 19 June 2013 transcript are designated R₂.

daughter, who had been washing the dogs. (FoF 6, 7, 8.) She allowed the Security personnel to enter the residence to conduct a welfare check on the younger daughter. (FoF 10.) They observed the home as they moved from the front door to the basement.[2] (FoF 11.) The younger daughter was interviewed and the Security personnel completed paperwork for the welfare check. (FoF 15, 19.) They determined that this was a family matter and not a criminal matter. (FoF 15.) However, from their interview of the younger daughter, they were aware that there was a firearm on the premises.[3] (FoF 23.) They departed the premises. (FoF 20.) The Security officer contacted his dispatcher concerning whether the accused had any firearms registered on base. (FoF 21.) He found out that she did not have any weapons registered. (FoF 29.)

The accused arrived and found the Security personnel outside her residence. (FoF 18, 19, 20.) She had a conversation with them about the delinquency/welfare call. (FoF 22.) They entered the house with her. (FoF 25.) The Security officer asked her where the weapon was in the house, without having advised her of her rights. (FoF 26, 27.) She admitted the existence of the weapon in the house. (FoF 28.) The Security personnel proceeded to conduct further interviews. (FoF 30.) The accused prepared a written statement while Security personnel were searching the residence.[4] (FoF 31.)

The Security force's knowledge of the firearm's existence was based on their entering rooms outside of the Welfare visit and interviews with a 12-year-old as well as with the accused.[5] (Appellate Ex. 46 at 6.)

---

[2] Testimony was uniformly to the effect that the younger daughter was in the basement, the older daughter initially led the Security personnel through the living room to the basement, and the Security personnel and the younger daughter shortly thereafter convened in the living room where the younger daughter was interviewed. There are no findings of fact as to these details. There is conflicting evidence as to where in the house the Security personnel went, if anywhere, after the initial convening in the living room, while the accused was not present.

[3] The only clear evidence on this point was a form filled out based on the interview with the younger daughter, which recited that there was a rifle in the kitchen. However, there is no finding of fact concerning what the Security personnel knew about the location of the firearm.

[4] There is no finding of fact about the subject of the interviews or her statement, but the evidence includes statements by the accused and by her older daughter on the subject of the younger daughter and her nonattendance at school, and related matters. There is nothing in these statements about a firearm.

[5] This finding of fact appears under Legal Standards and Conclusions of Law in Appellate Exhibit 46, not in the Findings of Fact section. The statement also includes the older daughter as a source of Security force knowledge of the firearm, but that is unsupported by any evidence.

The Security force called the Lincoln Police Department, and two Lincoln police officers came to the residence. (FoF 32, 33.) The Security officer briefed them on the existence of a disassembled Bushmaster XM 15 rifle inside an unsecured case on the floor of the kitchen. (FoF 34.) Also, an investigator from Security arrived at the residence, and after arrival of the Lincoln police officers, he looked in the case and observed both the Bushmaster rifle and ammunition. (FoF 35.) The ammunition was declared to be federal property. (*Id.*) The accused was apprehended. (FoF 36.) Further investigation revealed no evidence that the ammunition was stolen from government sources, and the case category was changed from Larceny of Government Property to an offense of having an unregistered firearm. (FoF 38.)

Later, the accused made statements to Coast Guard Investigative Services (CGIS) and consented to the search of her home after being read her Article 31 rights and executing a permissive search authorization. (FoF 40.) Items were recovered during the CGIS search. These items were the evidence suppressed in the military judge's ruling.[6] (*See* Appellate Ex. 46 at 10.)

## Discussion

The record is not clear as to what was admitted as evidence on the motion. There was testimony by a number of witnesses. Several documents were explicitly presented and discussed during the hearing on the motion; each of them was identified as an additional attachment to the defense's Motion to Suppress, Appellate Exhibit I, or to Government Response to Defendant's Motion to Suppress, Appellate Exhibit II. Also, Appellate Exhibit 34 was added to the record after the initial hearing. (R2 at 6.) These were all clearly considered on the motion. We believe that all materials attached to Appellate Exhibit II were considered as evidence, which includes the Hanscom Security Force Report and the CGIS Report.[7]

---

[6] There are no Findings of Fact as to what the items recovered were or even that items were recovered, but the concluding sentence in the Ruling paragraph in Appellate Exhibit 46 says, "Defense motion to suppress statements to CGIS and the evidence seized by the CGIS search is granted." (Appellate Ex. 46 at 10.) Thus, the military judge implicitly found that items were recovered. The testimony of a CGIS special agent and the CGIS report indicate that CGIS went to her residence to search for weapons, firearms and ammunition, and there obtained a Bushmaster rifle, model XM-15-E2S, and 215 rounds of ammunition, the items as to which the Government is appealing.

[7] The military judge quoted from the CGIS report; for example, in FoF 38 he quoted from Appellate Exhibit II, page 60 of 70.

There is no evidence of a search authorization or search warrant allowing any search or seizure from the accused's residence. The military judge noted that there was no search authorization. (Appellate Ex. 46 at 5.) He stated that the recognized exceptions to the requirement for a search authorization of emergency aid, hot pursuit or imminent destruction of evidence did not exist. We agree with the military judge on these conclusions.

The military judge also noted the absence of any police exigency. There is testimony from one of the Security personnel that based upon the information from the younger daughter that there was a firearm on the premises, one of the Security personnel was posted between the kitchen and the living room to prevent anyone from getting to the firearm. ($R_1$. at 160.) Although there is no Finding of Fact based on this evidence, it demonstrates that such a situation would not likely create an exigency requiring search or seizure, as simple vigilance would suffice to protect the officers' safety while they were in the home with the accused and her daughters. We agree that there was no police exigency.

The military judge then considered the possibility of the accused's consent to a search. As he noted, consent to search must be established by clear and convincing evidence. Military Rule of Evidence 314(e), Manual for Courts-Martial, United States (2012 ed.). He concluded that the Government had failed to show by clear and convincing evidence that the accused consented to a search of her residence by the Security officer. Presumably, that conclusion extended to any search that led to the discovery of the rifle and the ammunition, be it a search of the residence or a search of the rifle case. The Findings of Fact relating to this conclusion are extremely meager. Here is the relevant extract from earlier in this opinion:

> The Security officer asked her where the weapon was in the house, without having advised her of her rights. She admitted the existence of the weapon in the house. . . . She prepared a written statement while Security personnel were searching the residence.[8]

(Citations omitted.)

However, the only specific evidence that the accused consented to the search that led to the discovery of the rifle and ammunition is the testimony of the Security officer, whom the

---

[8] Evidence supporting that the accused was asked where the weapon was in the house and that she admitted its existence is found in the CGIS report, which summarizes the CGIS interview of the accused. (Appellate Exhibit II, page 62 of 70.)

military judge makes clear he does not find credible. (FoF 39.)[9] Since the Government has the burden of proof and there is no other evidence of consent, the conclusion is inescapable that consent to the search has not been established.[10]

The military judge also found that the CGIS search was a continuation of the earlier illegal search and the arrest based on the illegal search, with no intervening circumstances that would purge the primary taint. Although there are no findings of fact supporting this conclusion, the evidence is that the rifle and ammunition were seized by Security personnel ($R_1$ at 70-71) and were later turned over to CGIS personnel before CGIS personnel conducted any search (Appellate Ex. II, page 65 of 70). Accordingly, we will not further scrutinize this conclusion of the military judge; consideration beyond the Security search is unnecessary to our review of the military judge's ruling.

The Government argues that the rifle should not be excluded from evidence because the Security personnel had probable cause from an independent source, i.e. statements made by the younger daughter, to seize it. The Government also argues that the rifle would have been inevitably discovered.

It should be borne in mind that searches and seizures are not always simultaneous. Sometimes a seizure occurs without a search, as when an object is discovered in plain view and then seized. Further, sometimes law enforcement authorities seek to open a closed container to determine what is inside; the opening may be a search separate from any other search (or discovery in plain view or the like) that revealed the closed container to the authorities. Whether there was authority to search at macro or micro level or to seize may be separate questions to be analyzed separately.

That the Security personnel had probable cause to believe there was a firearm on the premises does not mean they had authority to enter the kitchen, open the closed case that they

---

[9] The finding that the Security officer's testimony lacks credibility is not clearly erroneous.

[10] The Government's argument that the military judge erred when he found no voluntary consent makes much of the evidence that would support voluntariness. It ignores the fact that the evidence of consent itself (voluntary or otherwise) is limited to the testimony of a single witness, which witness the military judge explicitly found not credible (FoF 39). Without evidence of some sort of putative consent, voluntariness is a *non sequitur*.

found there, and seize the rifle and ammunition found therein. It only meant that they had an ingredient that could have led to authority to conduct further intrusions and to seize evidence of a crime found as a result. Authority to search for or to seize the rifle would not necessarily include authority to seize the ammunition.

Implicit in the military judge's conclusion that the Government had failed to show that the accused consented to a search is the conclusion that consent to a seizure also had not been shown.

In short, there was no search authorization, no exception to the requirement for such an authorization, and no consent allowing for seizure of the Bushmaster XM-15 rifle and ammunition. The military judge did not err in suppressing them.

## Decision

The Government's appeal is denied.

Judges NORRIS and GILL concur.

For the Court,


L.I. McClelland
Chief Judge